663 P.2d 1105

**Donald E. NASH, Claimant-Respondent,**

v.

**BOISE CITY FIRE DEPARTMENT, Employer,**

**and**

**Fireman's Retirement Fund, Defendant-Appellant.**

No. 13746.

Supreme Court of Idaho.

May 26, 1983.

Blaine Evans, Paul S. Boyd and Hugh Mossman, Boise, for defendant-appellant.

Gardner W. Skinner and Berry Newal Squyres, Boise, for claimant-respondent.

HUNTLEY, Justice.

In 1978 the legislature amended I.C. § 72–1432B governing retirement benefits to firemen. From 1963 to 1976 the statute had provided that the monthly retirement checks would be adjusted upward or downward by a percentage equal to the percentage the average paid firefighters salary or wages varied each year.

In 1976 the statute was amended to peg the adjustment annually according to the determination of the "cost of living adjustment" as set forth in I.C. § 72–1432B. The 1978 amendment provided that this increase or decrease would not exceed 3%. The issue presented is whether this 3% "cap" applies to firefighters retiring after the July 1, 1978 effective date of the amendment, who earned benefits by virtue of service prior to that date.

Nash was a full time paid firefighter of Boise City from October 11, 1953, through October 17, 1978, a period of twenty-five years and five days. On August 31, 1978, Nash filed his Fireman's Retirement Benefit Fund application, which was approved by the manager of the State Insurance Fund and the Industrial Commission.

Following the approval of the Industrial Commission an "agreement for voluntary retirement" was prepared and submitted to Nash for approval and signature. Nash interposed objection only to the part of the agreement which provided that the benefits received would not increase or decrease by more than 3% per annum.

Nash filed a claim with the Industrial Commission for benefits and requested a hearing seeking an order from the Commission authorizing and requiring benefit payments pending determination of the applicability of the 3% cap. The Fund responded by answer, alleging that the cap applied to Nash; that as of that date Nash had not suffered a diminution in benefits; and that the Commission was without jurisdiction to hear and determine the constitutionality of the statute.

The Commission ordered the Fund to make payments to Nash and reserved for determination the applicability of I.C. § 72–1432B.

Subsequently, Nash filed an application for review and modification of the award contending that with the passage of a year the average annual salary had increased.

The Fund answered, raising the jurisdiction of the Commission to pass on the constitutionality of the section, and denying that the section violates the United States and Idaho Constitutions.

Following hearing the referee entered findings of fact, conclusions of law and order, which were confirmed, approved and adopted by the Commission. The order held that the benefits should be paid without regard to the 3% limitation. The evidence established the cost of living increases for 1979 and 1980 at 6.76% and 6.98% respectively.

Decision of the issue presented requires a determination of whether the level of a public employee's rights in a pension plan which has vested may be unilaterally altered by subsequent legislative act. As stated in *Dullea v. Massachusetts Bay Transportation Authority*, 421 N.E.2d 1228, 1232 (Mass.App.1981),

"The answer to this question requires a threshold determination whether the benefits embodied in the plaintiff's agreement are to be analyzed under ordinary contract law principles or whether they are better suited for the analysis reserved for modifications of publicly funded pension programs."

In *Dullea, supra,* in a thoughtful and well-reasoned analysis, the court reviewed the two approaches the courts had historically taken in approaching the issue:

"For many years, the courts used one or the other of two radically different theories to determine the effect of modifications of governmental pension plans. A numerical majority of jurisdictions, including Massachusetts, treated benefits under these plans as mere gratuities which could be changed or revoked to the employee's detriment at any time—even if the promised benefits had been taken in part from an employee's own salary, and sometimes even if the employee had satisfied all the conditions required to qualify for his pension. See, e.g. (outside of Massachusetts), *Pennie v. Reis,* 132 U.S. 464, 10 S.Ct. 149, 33 L.Ed. 426 (1889); *Bergin v. Board of Trustees of Teachers' Retirement Sys.,* 31 Ill.2d 566, 574, 202 N.E.2d 489 (1964); *Patterson v. Baton Rouge,* 309 So.2d 306, 311–313 (La.1975); *Mollner v. Omaha,* 169 Neb. 44, 59–65, 98 N.W.2d 33 (1959); *Dallas v. Trammell,* 129 Tex. 150, 101 S.W.2d 1009 (1937); and (in this state) *Foley v. Springfield,* 328 Mass. 59, 102 N.E.2d 89 (1951); *Kinney v. Contributory Retirement Appeal Bd.,* 330 Mass. 302, 113 N.E.2d 59 (1953); *Smolinski v. Boston Retirement Bd.,* 346 Mass. 210, 190 N.E.2d 877 (1963). See also the discussion of the last three cases in *Opinion of the Justices,* 364 Mass. 847, 856–858, 303 N.E.2d 320 (1973). The remaining jurisdictions considered the promise of a pension, once accepted, as creating an irrevocable contractual commitment to pay the pension which was immune from any modification by the public employer which would effect a reduction in benefits. See, e.g., *Yeazell v. Copins,* 98 Ariz. 109, 402 P.2d 541 (1965); *Bender v. Ang-*

lin, 207 Ga. 108, 60 S.E.2d 756, *cert. denied,* 340 U.S. 878, 71 S.Ct. 125, 95 L.Ed. 638 (1950); *Wright v. Allegheny County Retirement Bd.,* 390 Pa. 75, 79–80, 134 A.2d 231 (1957)...." Mass.App., 421 N.E.2d at 1233.

*Dullea, supra,* next presents a cogent analysis of the reasons why both the gratuity theory and the contract theory suffer from infirmities which undercut their utility in solving problems caused by today's complex public pension systems:

"The chief defect of the gratuity hypothesis is that, in practice, it can be unjust. Public employees are likely to rely on promises of retirement benefits when initially accepting employment, when deciding whether to continue in government service, and when planning their future. They are exposed to severe hardship, if, after a long period of service, the promised pensions are reduced or retracted. See *Hickey v. Pittsburgh Pension Bd.,* 378 Pa. 300, 302, 106 A.2d 233 (1954); Note, Contractual Aspects of Pension Plan Modification, 56 Colum.L.Rev. 251, 254 (1956); Note, Public Employee Pensions in Times of Fiscal Distress, 90 Harv.L. Rev. 992, 997 (1977). Contract analysis is cumbersome and suffers from at least two flaws. First, it distorts reality, because the establishment of a governmental pension plan bears at most only a general resemblance to negotiation and formation of a contract. These programs are almost always instituted unilaterally without prior consultation with prospective beneficiaries. The express consent of the employee, if it is required at all, is usually a formality, and there is no 'bargained-for' consideration in the usual sense of that concept. The second infirmity in the contract analysis is that, by freezing the provisions of the plan without any adjustments, serious harm can occur to the governmental entity that created it. Changes in policies, commitments, and financial conditions can make plans drafted under favorable conditions unrealistic and burdensome on the government employer. See, e.g., *Talbott v. Independent Sch. Dist.,* 230 Iowa 949, 299 N.W. 556 (1941); *Newcomb v. Ogden City Pub. Sch. Teachers' Retirement Comm.,* 121 Utah 503, 243 P.2d 941 (1952)." Mass.App. 421 N.E.2d 1228, n. 9, at 1233–34.

Earlier, in *Opinion of the Justices,* 364 Mass. 847, 303 N.E.2d 320 (Mass.1973), the Massachusetts court sought to channel the reasoning process away from strict "gratuity" or strict "contract" analysis toward a more meaningful basis for analysis:

" 'The label "gratuity" could never have been taken with sober literalness, and so also for "contract." It is not really feasible—nor would it be desirable—to fit so complex and dynamic a set of arrangements as a statutory retirement scheme into ordinary contract law which posits as its model a joining of the wills of mutually assenting individuals to form a specific bargain. As the commentators show, a retirement plan for public employees does not readily submit itself to analysis according to Professor Williston's canons.... When, therefore, the characterization "contract" is used, it is best understood as meaning that the retirement scheme has generated material expectations on the part of employees and those expectations should in substance be respected. Such is the content of "contract."

It is true that a few cases that adopt the label of "contract" have approached the terms of a retirement plan as they would a bond indenture, but closer to the realities is the view that "contract" protects the member of a retirement plan in the core of his reasonable expectations, but not against subtractions which, although possibly exceeding the trivial, can claim certain practical justifications. Attention should then center on the nature of these justifications in the light of the problems of financing and administering these massive plans under changing conditions.' (citations and footnotes omitted.)" *Dullea, supra,* quoting *Opinion of the Justices,* 364 Mass. at 861–862, 303 N.E.2d 320.

In *Hanson v. City of Idaho Falls,* 92 Idaho 512, 514, 446 P.2d 634 (1968), this court placed Idaho squarely in line with Massachusetts and other jurisdictions which reject both the gratuity and the strict contract theory, holding further that reasonable modification can be made to keep the plan flexible:

> "The better reasoned rule in most American jurisdictions today is that the rights of the employees in pension plans such as Idaho's Retirement Fund Act are vested, subject only to reasonable modification for the purpose of keeping the pension system flexible and maintaining its integrity. [Citations omitted.] Since the employee's rights are vested, the pension plan cannot be deemed to provide gratuities. Instead it must be considered compensatory in nature."

In *Engen v. James,* 92 Idaho 690, 693, 448 P.2d 977, (1969), we held that the legislature could not by later act take away vested retirement rights of a Coeur d'Alene policeman, stating,

> "Thus, if respondent had acquired pension rights under I.C. § 50–2116(i), those existing rights could not be taken from him by a later act of the legislature. This follows from the compensatory nature of pension plans, as this court held in the cited case. [*Hanson v. City of Idaho Falls, supra* ]"

*Abbott v. City of San Diego,* 165 Cal. App.2d 511, 332 P.2d 324 (Cal.App.1958), cited in *Hanson* concerned a modification of a pension plan, changing it from a plan whereunder the benefit fluctuated with prevailing salary scales to a plan for payment on a fixed formula basis. The court held that the modifications could not be applied to firemen employed before the effective date of the modification. The court stated at 332 P.2d 328:

> " 'To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable

new advantages.' *Allen v. City of Long Beach,* 45 Cal.2d 128, 131, 287 P.2d 765, 767. ' * * * it is advantage or disadvantage to the particular employees whose own contractual pension rights, already earned, are involved which are the criteria by which modifications to pension plans must be measured' (*Abbott v. City of Los Angeles,* 50 Cal.2d 438, 326 P.2d 484, 489). . . ."

The pension fund in *Abbott* argued, as the Fund here argues, that the modification was necessary to keep the fund flexible and actuarily solvent. The court rejected this argument, stating,

> "This argument neglects consideration of the requirement that any such change must be reasonable and must be related to the integrity of the system as applied to the vested rights under consideration. [Citations] There is no showing in the instant case that the amendments under consideration 'bear any material relation to the integrity or successful operation or to the preservation or protection of the *pension program applicable to these plaintiffs.*" (Emphasis in original.) *Id.* 332 P.2d at 330.

*Abbott* was reaffirmed in *Betts v. Board of Admin. of Publ. Emp. Ret. System,* 21 Cal.3d 859, 148 Cal.Rptr. 158, 582 P.2d 614 (Cal. 1978).

Washington has also imposed the requirement of corresponding advantages when a pension system is modified. *Bakenhus v. Seattle,* 48 Wash.2d 695, 296 P.2d 536 (1956), cited in *Hanson; Washington Ass'n of City Officials v. Washington Pub. Emp. Ret. Sys. Bd.,* 89 Wash.2d 729, 575 P.2d 230 (Wash.1978); and *Eagan v. Spellman,* 90 Wash.2d 248, 581 P.2d 1038 (Wash.1978).

In *Betts v. Board of Admin. of Pub. Emp. Ret. Sys.,* 21 Cal.3d 859, 148 Cal.Rptr. .158, 161, 582 P.2d 614, 617 (Cal.1978), decided twenty years after *Abbott v. San Diego, supra,* the court summarized the principle which must be considered by the courts in determining whether a modification is reasonable:

> "However, there is a strict limitation on the conditions which may modify the

pension system in effect during employment. We have described the applicable principles as follows: 'An employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. [Citations.] Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, *and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.* [Citations.] . . .' (*Allen v. City of Long Beach* (1955) 45 Cal.2d 128, 131, 287 P.2d 765, 767, (italics added.) We recently reaffirmed these principles in *Miller v. State of California* (1977) 18 Cal.3d 808, 816, 135 Cal.Rptr. 386, 557 P.2d 970.

In *Allen,* supra, we explained why the substitution of a 'fixed' system of benefit computation for a 'fluctuating' system constitutes a disadvantage to affected employees: 'Payment of a fixed amount freezes the benefit at a figure which is based on salary scales preceding retirement, thus the longer an employee is retired on a fixed pension the more likely it is that the amount of his pension will not accurately reflect existing economic conditions, whereas a retired employee receiving a fluctuating pension based on the salaries that active employees are currently receiving can maintain a fairly constant standard of living despite changes in our economy.' " (Italics in original.)

Finally, *Dullea, supra,* notes that California has developed the "more realistic guidelines" for analyzing the rights of the parties and encapsulates those guidelines at 421 N.E.2d 1235:

"First, the California decisions strongly suggest that an employee's rights to a pension will not vest until he has worked for a legally significant period of time in reliance on the belief that he will be protected by a pension. See *Kern v. Long Beach,* 29 Cal.2d 848, 855, 179 P.2d 799 (1947) (the right arises 'as soon as [the employee] has performed substantial services for his employer'). See also *Houghton v. Long Beach,* 164 Cal.App.2d 298, 305, 330 P.2d 918 (1958); *Frank v. Board of Admin. of Pub. Emp. Ret. Sys.,* 56 Cal.App.3d 236, 241, 128 Cal.Rptr. 378 (1976). Second, despite the vesting of the employee's entitlement, the public employer retains some authority to make 'reasonable' modifications in its pension program in order to meet 'changing conditions' and to 'maintain the integrity of the system,' provided that 'changes in a pension plan which result in disadvantage to employees [are] accompanied by comparable new advantages.' *Allen v. Long Beach,* 45 Cal.2d 128, 131, 287 P.2d 765 (1955). *Miller v. California,* 18 Cal.3d 808, 816, 135 Cal.Rptr. 386, 557 P.2d 970 (1977). *Betts v. Board of Admin. of Pub. Employees' Retirement System,* 21 Cal.3d 859, 864, 148 Cal.Rptr. 158, 582 P.2d 614 (1978). In the *Houghton* case, 164 Cal. App.2d at 306, 330 P.2d 918, for example, an increase in employee contributions without any compensating increase in benefits was upheld on a showing by the city that the additional revenues would result in improved financial stability for the system. These principles avoid rigid adherence to strictly formalistic doctrine by balancing the interests of the governmental employer in revising plans to ensure their soundness with the legitimate reliance interests of employees who look to pensions as a substantial benefit accruing from the satisfactory performance of long-term service. The essence renders the entitlements of both parties subject to reasonable limitations. The government, on the one hand cannot make unilateral or capricious changes in pension programs which have been held out to employees 'as in substance delayed compensation for their services, and [relied

upon] . . . as a security against destitution in their old age and against catastrophe.' *Opinion of the Justices,* 364 Mass. at 858, 303 N.E.2d 320. Conversely, an employee may not insist that his expectations be fulfilled unless they are premised on an adequate period of service and practically justified in circumstances."

In applying the foregoing principles to the instant case, we first note the following facts established in the record:

(1) The rights of Nash are unquestionably vested, he having worked twenty-five years, the last fifteen of which included the period when the pension plan provided for a fluctuating formula free of the 3% "cap."

(2) The Firemen's Retirement Fund is not insolvent or unable to meet its obligations either now or in the near future.

(3) The Fund, assuming the present levels of income to it, will grow for fifteen or twenty years, then level off and then become zero within another ten years. (It would appear the Fund's growth period will include the period of Nash's life expectancy.)

 Under these facts, and upon the basis of the authorities hereinabove set forth, we hold that the Industrial Commission did not err in ordering that the retirement benefits of Nash be paid in 1979 and subsequent years calculated on the percentage increase or decrease in the average paid firefighter's salary or wage without regard to the 3% limitation contained in I.C. § 72–1432B, as amended in 1978.

Appellants raise as error the refusal of admission into evidence of proposed exhibits (actuarial studies) to support their contention that the legislative purpose in enacting the 1978 amendment was to maintain the solvency and integrity of the Fund. The examiner correctly ruled that since the studies did not come into existence until after the Act was passed, they could not constitute evidence of purpose at the time of passage.

Appellants provided a supplemental brief citing two cases for the proposition that modifications acting to the detriment of the employee can be made without providing corresponding benefits. *Louisiana State Troopers Ass'n v. Louisiana State Police Ret. Board,* 417 So.2d 440 (La.App.1982); *Florida Sheriff's Ass'n v. Dept. of Admin.,* 408 So.2d 1033 (Fla.1982). Those cases involved jurisdictions where the employee's rights do not vest until retirement.

In quoting *Dullea, supra,* and *Houghton, supra,* with general approval, we would make clear that we do not decide two rules of law which might appear to be enunciated therein.

The first is the suggestion in *Dullea* that the government can reduce benefits when the plan becomes "financially burdensome" to an employer. Once the employee's rights have vested, it is not unreasonable to expect that under some circumstances an increased level of employer contribution (requiring increased tax levies) might be required without looking to increased employee contributions or a reduction of benefits.

Conversely, there can be extraordinary circumstances where the employee may be required to increase his contributions without a corresponding increase in benefits in order to preserve the financial integrity of the system. However, those circumstances are not presented by this record.

We have considered appellant's other assignments of error and find them to be without merit.

The order of the Industrial Commission is affirmed. Costs to respondent.

DONALDSON, C.J., and SHEPARD, BAKES and BISTLINE, JJ., concur.